IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| PAMELA C.,[1] | ) | |
| | ) | Civil Action No. 7:22-cv-00465 |
| Plaintiff, | ) | |
| v. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| MARTIN O'MALLEY,[2] | ) | By: C. Kailani Memmer |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Pamela C. ("Pamela") filed this action challenging the final decision of the
Commissioner of Social Security ("Commissioner") finding her not disabled and therefore
ineligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42
U.S.C. §§ 1381–1383f. Pamela alleges that Administrative Law Judge David Lewandowski
("ALJ") erred in his assessment of Pamela's (1) mental impairments; (2) subjective allegations;
and (3) physical impairments and residual functional capacity ("RFC") findings.

This matter is before me on referral under 28 U.S.C. § 636(b)(1)(B), dated October 12,
2023. ECF No. 27. Having considered the administrative record, the parties' filings, and the
applicable law, I find that the Commissioner's decision is supported by substantial evidence.
Accordingly, and for the reasons detailed below, I respectfully recommend that the presiding
District Judge enter an order **GRANTING** the Commissioner's Motion for Summary Judgment,
ECF No. 25; **DENYING** Pamela's Motion for Summary Judgment, ECF No. 23; **AFFIRMING**

---

[1] Due to privacy, I use only the first name and last initial of the claimant in social security opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi
as the defendant in this suit. No further action need be taken to continue this suit by reason of the last
sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

the final decision of the Commissioner; and **DISMISSING** this case from the Court's active

docket.

## <u>STANDARD OF REVIEW</u>

The court limits its review to a determination of whether substantial evidence exists to

support the Commissioner's conclusion that Pamela failed to demonstrate that she was disabled

under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it

consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and

alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing

that the standard for substantial evidence "is not high"). While substantial evidence is a

somewhat deferential standard, the Court does not "reflexively rubber-stamp an ALJ's findings."

*Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017).

"In reviewing for substantial evidence, [the court should not] undertake to re-weigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the

[Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589). Nevertheless, the

court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize

the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v.*

*Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment, which can be expected to result in death or
which has lasted or can be expected to last for a continuous period for not less than 12 months." 42
U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant
suffers from an impairment which affects her ability to perform daily activities or certain forms of work;
instead, a claimant must show that her impairments prevent her from engaging in all forms of substantial
gainful employment given his age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2),
1382c(a)(3)(B).

affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## **CLAIM HISTORY**

Pamela previously filed for SSI on June 24, 2010, alleging disability beginning on April 15, 2000, which was denied by an ALJ decision on July 12, 2012. R. 13. On July 29, 2014, Pamela filed her current claim for SSI pursuant to Title XVI of the Act, alleging disability beginning March 1, 2002.[4] R. 879. The claim was denied initially on June 23, 2015, and upon reconsideration on October 22, 2015. R. 959–69. A previous ALJ decision denied Pamela's claim on December 26, 2017, and that decision was remanded by this Court on October 30, 2020. *Id.*

On May 19, 2021, ALJ Lewandowski held a telephone hearing at which Pamela testified. R. 906–25. At that hearing, Pamela amended her onset date to July 29, 2014, the application date. R. 910. The record was left open after that hearing "for additional developments and to obtain a consultative psychological examination." R. 879. On February 1, 2022, the ALJ held another telephone hearing. R. 3409–20. On April 27, 2022, the ALJ entered his decision

---

[4] The relevant period for this claim begins on the date of Pamela's application, July 29, 2014. *See* 20 C.F.R. § 416.202 (explaining that a claimant is not eligible for SSI until, among other factors, she files an application for SSI benefits); 20 C.F.R. § 416.501 (stating that a claimant may not be paid SSI for any period that precedes the first month she satisfies the eligibility requirements, which cannot pre-date the date on which an application was filed).

analyzing Pamela's claims under the familiar five-step process[5] and issuing an unfavorable

decision denying Pamela's claim for benefits. R. 876–98.

At step one, the ALJ found that Pamela had not engaged in substantial gainful activity

since July 29, 2014, the application date. R. 882. At step two, he found that Pamela has the

following severe impairments: cervical and lumbar degenerative disc disease; fibromyalgia;

seizure disorder; chronic obstructive pulmonary disease; stroke/anoxic brain injury; bipolar

disorder; and polysubstance abuse. *Id.*

At step three, the ALJ found that Pamela's impairments, either individually or in

combination, did not meet or equal a listed impairment. R. 882–85. The ALJ specifically

considered Listings 1.00 (musculoskeletal disorders), 1.15 (disorders of the skeletal spine

resulting in compromise of a nerve root), 3.02 (chronic respiratory disorders), 11.02 (epilepsy),

11.04 (vascular insult to the brain), 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar

and related disorders), 14.02 (systemic lupus erythematosus), 14.04 (systemic sclerosis

(scleroderma)), and 14.06 (undifferentiated and mixed connective tissue disease). R. 882–83.

The ALJ concluded that Pamela has mild limitations in understanding, remembering, or applying

information. R. 883. He further concluded that Pamela has moderate limitations in interacting

---

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence,
whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or
equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5)
whether she can perform any other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (per
curiam) (citing 20 C.F.R. § 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The inquiry
ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§
404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to
establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to
establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimants
age, education, work experience, and impairments, to perform available alternative work in the national
economy. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

with others, as well as in concentrating, persisting, or maintaining pace. R. 884. Lastly, he

concluded that Pamela has no limitation in adapting or managing oneself. R. 885.

The ALJ concluded that Pamela has the RFC:

> [T]o perform light work as defined in 20 CFR 416.967(b), except [Pamela] can
> occasionally perform postural activities but should avoid concentrated exposure to
> industrial hazards including unprotected heights. She should avoid concentrated
> exposure to pulmonary irritants, temperature extremes, humidity, and vibrations.
> [Pamela] can perform simple, unskilled tasks and maintain attention and
> concentration for two-hour periods with normal breaks. She can have occasional
> interactions with others. [She] is expected to be off task ten percent of the workday.

R. 25.

At step four, the ALJ found that Pamela had no past relevant work. R. 896. Finally, at

step five, the ALJ relied on the vocational expert's ("VE") testimony to find that given her

vocational profile and RFC, Pamela could perform work existing in significant numbers in the

national economy, including as a sorter, marker, or photocopy machine operator. R. 897. Overall,

then, the ALJ found that Pamela was not disabled within the meaning of the Act. *Id.* This appeal

followed.

## ANALYSIS

Pamela argues that the ALJ erred in his assessment of Pamela's (1) mental impairments;

(2) subjective allegations; and (3) physical impairments and RFC findings. ECF No. 24 at 26–47.

### A.  Medical History Overview

Pamela was born on December 15, 1967, and has a high school education. R. 912. She

has not worked in the last 15 years. *Id.* However, she does have previous work experience as a

cosmetologist. *See* R. 40, 107, 225–28.

On December 20, 2000, Pamela was involved in a serious motor vehicle collision that

caused five ruptured discs and pinched sciatic nerve, for which she was prescribed narcotic pain

medication. *See* R. 2439. She suffered a heroin overdose in December 2003. *See* R. 2453–62.

On March 25, 2010, Pamela presented to the emergency department at Roanoke Memorial Hospital with complaints of frequent seizures, including an unwitnessed seizure the night before. R. 501–505. She indicated that she suffers grand mal seizures and usually refuses medical treatment after them. R. 501. Physical examination findings were unremarkable. *Id.* CT imaging of Pamela's head revealed no acute intracranial injuries or abnormalities aside from mild mastoid opacification. R. 505.

On August 9, 2010, Pamela presented to the care of Beverley Brown, M.D., at Roanoke Salem Family Medicine for a new patient evaluation. R. 490–93. Pamela indicated a history of asthma, anxiety and stress, bipolar disorder, tobacco use, and gestational diabetes mellitus. R. 490. Pamela was homeless at that time. R. 491. Psychological review of systems ("ROS") was positive for anxiety, concentration difficulties, and bipolar disorder. R. 492. Respiratory ROS was positive for tachypnea. *Id.* Dermatological ROS was positive for skin lesion changes, and Dr. Brown noticed a history of multiple pustules in Pamela's upper trunk and forearm areas. *Id.* Physical examination findings were unremarkable aside from anxiousness, an affect inappropriate to mood, racing thought process, and "speech—hyper." *Id.* Dr. Brown noted a history of drug abuse. R. 493. Dr. Brown restarted Pamela on lithium for bipolar disorder and referred her to a psychiatrist. *Id.*

On October 28, 2010, Pamela returned to Roanoke Salem Family Medicine for a follow-up appointment. R. 487–88. Records indicate that Pamela was not taking her lithium for bipolar disorder. R. 487. However, Pamela's mood and anxiety were improving at that time. *Id.* Physical examination findings were unremarkable. R. 488.

On November 3, 2010, Pamela presented to the emergency department at Roanoke Memorial Hospital with complaints of constipation. R. 484–86. ROS findings were positive for

mild headaches, abdominal pain, and constipation. R. 484. Chest x-rays showed slightly

hyperexpanded lungs suspicious for underlying chronic obstructive pulmonary disease

("COPD"). R. 485.  Providers discharged Pamela after she received successful treatment for

constipation, which secondarily improved her breathing. R. 486.

     On May 18, 2011, Pamela presented to the emergency department at Roanoke Memorial

Hospital with complaints of pain in her right knee and both ankles after a fall. R. 464–68. ROS

was positive for joint pain and falls. R. 464. Physical examination findings were unremarkable.

R. 465. X-ray imaging of Pamela's ankles was unremarkable and showed no fracture or

dislocation. R. 466–67. The final impression was contusion to knee and bilateral ankles. R. 468.

     On June 5, 2012, Pamela called Roanoke Salem Family Medicine with complaints of

severe back pain, which she rated "15 out of 10," after falling and twisting her back. R. 444. She

reported a history of "5 bulging discs," and asked if she could be prescribed Percocet. *Id.*

     On June 7, 2012, Pamela presented to the emergency department at Roanoke Memorial

Hospital after a motor vehicle rear-end collision the night before. R. 441–44. Neither police nor

EMS were called to the collision. R. 441. Pamela complained of left foot pain. R. 442. Pamela

denied any new back pain. *Id.* ROS was positive for chronic back pain and joint pain. *Id.*

Physical examination findings revealed tenderness in the left foot. *Id.* X-ray imaging revealed an

avulsion fracture at the base of the second metatarsal on the left foot. R. 443. Pamela was

prescribed Percocet as needed for pain. *Id.*

     On June 10, 2012, Pamela presented to the emergency department at Roanoke Memorial

Hospital with complaints of left foot pain. R. 439–41. Pamela had removed the splint from her

lower leg and indicated that she was out of pain medication. R. 439. ROS was positive for joint

pain. *Id.* Physical examination findings were unremarkable except for tenderness of the foot. R. 439–40. Pamela received a new splint. R. 440–41.

On June 14, 2012, Pamela presented for an orthopedic follow-up. R. 436–38. Pamela complained of left foot pain and reported that while driving as a passenger in a vehicle, "she was reaching in the back for a drink out of the cooler when her husband slammed on the breaks [sic] and her left foot hit the emergency brake. She immediately had pain and discomfort." R. 437. The record indicates that Pamela continued to remove her splint several times. *Id.* Pamela reported that she was using Percocet for her pain and asked for more at that follow-up appointment. *Id.* Pamela received a prescription for Lortab and Phenergan. R. 438.

On June 18, 2012, Pamela called Roanoke Salem Family Medicine complaining of foot and back pain. R. 436. She stated that Lortab was too hard on her stomach and asked for a prescription for Percocet, stating that she needed it. *Id.*

On August 21, 2012, Pamela presented to the emergency department at Roanoke Memorial Hospital via EMS after a syncopal episode. R. 426–31. Pamela reported she had only eaten a grilled cheese sandwich in the past day-and-a-half. R. 427. ROS was positive for nausea, back pain, and seizures. *Id.* Physical examination findings were unremarkable. *Id.* X-ray imaging of the lumbar spine revealed no abnormalities, no vertebral body malalignment, no fracture or dislocation, and the vertebral bodies and disc spaces were well-maintained each level. R. 430. Pamela ate a box lunch and juice, and she afterwards stated that she felt much better after eating. R. 431.

On September 7, 2012, Pamela returned to Roanoke Salem Family Medicine with complaints of back pain. R. 423–26. She rated her back pain as 10 out of 10. R. 42. ROS was positive for suspicious skin lesions, left foot pain, back pain, seizures, anxiety, and depression.

R. 424. Physical examination findings revealed red macules over her hands, abdomen and chest; low back tenderness; and pressured speech. *Id.* Pamela asked for pain medications. *Id.*

On September 25, 2012, Pamela called Roanoke Salem Family Medicine to report a seizure. R. 422.

On November 28, 2012, Pamela presented to the care of Tejal Raju, M.D., for pain management. R. 416–19. She reported lower back pain radiating down both legs bilaterally, though with greater pain on the right side. R. 417. Physical examination findings revealed antalgic gait secondary to right foot pain; inability to extend the back secondary to pain; and paraspinal tenderness. R. 418. Dr. Raju assessed Pamela with chronic neck pain, chronic low back pain, and fibromyalgia. R. 419. Dr. Raju referred Pamela to physical therapy and prescribed 75 mg Voltaren twice daily. *Id.*

On June 30, 2013, Pamela presented to the emergency department at Roanoke Memorial Hospital after a fall with complaints of right foot pain. R. 390–94. X-ray imaging showed a mildly displaced avulsion fracture of the distal right fibula with extensive soft tissue swelling. R. 393.

On July 22, 2013, Pamela presented to the care of Jason Meador, PA, at New Horizons Healthcare. R. 359–60. Physical examination revealed lateral tenderness of the right ankle, as well as minor swelling and pain with eversion and inversion. R. 360. Mr. Meador refilled Pamela's Valium and Percocet and prescribed a Lidoderm patch for fibromyalgia. *Id.*

On November 12, 2013, Pamela returned to the care of Mr. Meador with complaints of increased pain from fibromyalgia. R. 356–57. Physical examination was unremarkable aside from congestion and bruising to the bridge of the nose. R. 357. Mr. Meador prescribed Savella and refilled Pamela's Percocet and Valium. *Id.*

9

On January 13, 2014, Pamela returned to the care of Mr. Meador with complaints of congestion and continued pain from fibromyalgia. R. 353–55. Physical examination findings were unremarkable. R. 354. Mr. Meador started Pamela on Keflex for an upper respiratory infection and refilled her Percocet, lisinopril, amitriptyline, and Tegretol. R. 354.

On June 23, 2014, Pamela returned to the care of Mr. Meador for disability paperwork. R. 351–52. Pamela complained of seizures in her sleep, consistent neck pain with decreased rotation, bilateral hand pain, bipolar disorder, mood disorder, PTSD, and numbness in her left hand. R. 351. Physical examination findings were unremarkable aside from tenderness on the trapezius muscle and a decreased range of motion in the neck. R. 352. Mr. Meador refilled Pamela's Percocet and Valium. *Id.*

On September 16, 2014, Pamela presented to the care of Catherine Parker, FNP, at New Horizons Healthcare. R. 348–49. Pamela complained of pain "all over" that she attributed to her fibromyalgia and requested a refill of her pain medication. R. 348. Physical examination findings were unremarkable. R. 349. Pamela submitted a urine screen that did not register a temperature, so Ms. Parker required Pamela to undergo a supervised urine screen. R. 349. Pamela asked to go smoke and did not return. *Id.* The record notes that she would no longer receive controlled medication from New Horizon Healthcare because of an adulterated drug screen and failure to submit a repeat specimen. R. 349.

On October 9, 2014, Pamela presented to the emergency department at Roanoke Memorial Hospital after a fall. R. 366–81. Physical examination revealed tenderness to the midline cervical back and lumbar spine; pain with movement of the pelvis; bruising to the medial aspect of the right knee; and a left knee abrasion. R. 367–68. A chest x-ray revealed no abnormalities. R. 368–69. CT imaging of the brain revealed no abnormalities. R. 369. CT

imaging of the cervical spine revealed a minimal anterior listhesis of C4 upon C5. *Id.* CT

imaging of the thoracic spine revealed no abnormalities. R. 369–70. CT imaging of the lumbar

spine revealed mild degenerative changes to the lumbar spine. R. 370. The final impression was

fall, seizure, and ovarian cyst. R. 375.

On December 27, 2014, Pamela presented to the emergency department at Roanoke

Memorial Hospital with complaints of neck pain. R. 363–66. She reported that she fell and re-

injured her neck. R. 363. She requested a referral to a pain management center. *Id.* ROS was

positive for congestion, cough, back pain, neck pain, and neck stiffness. R. 364. Physical

examination findings were unremarkable aside from tachycardia and numbness in the first and

third digits on the left side. R. 364–65. Pamela received a 60 mg Toradol injection. R. 365.

On February 2, 2015, Pamela returned to the care of Ms. Parker at New Horizons

Healthcare with complains of severe generalized pain. R. 624–26. Physical examination findings

revealed inflammation of the right auditory canal; tenderness in the cervical spine; limited range

of motion of the neck; tenderness to palpation in the cervical, low thoracic, and lumbar regions;

limited range of motion in the back; and numbness in the thumbs, first, and second fingers of

both hands. R. 625. Ms. Parker explained to Pamela that she would not prescribe narcotic pain

medication to her and referred her to behavioral health case management for mental health

support. *Id.*

On February 20, 2015, EMS transported Pamela to the emergency department at Roanoke

Memorial Hospital after she overdosed on Valium and other drugs. R. 634–58. The overdose was

a suspected suicide attempt. R. 637. Urine screen was positive for cocaine, opiates,

benzylpiperazine, and marijuana. *Id.* Pamela was transferred to the psychiatric unit because of

the possibility of a suicide attempt. R. 656.

On April 30, 2015, Pamela presented to the care of Wadid Zaky Salama, M.D., for a pain management follow-up. R. 631–33. Pamela reported diffuse body pain. R. 632. Physical examination was unremarkable. R. 633. Dr. Zaky Salama recommended a trial of 50 mg Topamax twice daily to be eventually increased to 100 mg. *Id.*

On August 21, 2015, Pamela presented to Pain Centers of the Blue Ridge for an initial evaluation. R. 844. Providers assessed her with chronic pain syndrome, cervicothoracic spasm and pain, lumbar spasms and pain, history of fibromyalgia, and history of thoracic fracture. *Id.* She received a prescription for tramadol. *Id.*

On October 2, 2015, Pamela returned to the Pain Centers of the Blue Ridge with complaints of neck, mid-, and low-back pain. R. 845. She received a prescription for Percocet. *Id.*

On September 11, 2015, Pamela presented to the emergency department at Roanoke Memorial Hospital with complaints of right ankle pain after a fall. R. 730–34. ROS was positive for neck pain and right ankle pain. R. 731. Physical examination findings were unremarkable aside from minimal proximal tenderness and tenderness to palpation over the right lateral malleolus. R. 732. Providers gave Pamela a Velcro splint and crutches. R. 733.

On October 20, 2015, Pamela presented to the care of Andrew Hilldrup, DO, at Carilion Clinic. R. 777–84. ROS was positive for myalgia, joint pain, rash, seizures, and headaches. R. 778. Physical examination revealed erythematous nodules on extremities; extensive dental caries; right ankle with compression brace; speaking with divergent thought processes; and evidence of splitting. R. 781. Dr. Hilldrup assessed Pamela as having an "extensive medical [history] of psych issues, drug abuse, poor dental hygiene, homelessness, and [hypertension]. All

of which are poorly controlled at this time." R. 782. Dr. Hilldrup restarted Pamela on 10 mg

Lisinopril daily and 300 mg lithium twice daily. R. 783.

On November 4, 2015, Pamela returned to Pain Centers of the Blue Ridge with

complaints of neck, mid-, and low-back pain. R. 846. She reported that she was feeling "a lot

better" with her current pain medication regimen. *Id.* Her medication was refilled. *Id.*

On December 2, 2015, Pamela returned to Pain Centers of the Blue Ridge with

complaints of neck and back pain. R. 847. She reported worsening leg pain. *Id.* Her medication

was refilled. *Id.*

On December 8, 2015, Pamela returned to the care of Dr. Hilldrup for a follow-up visit.

R. 797–800. She reported experiencing leg cramps for months, for which she had been

prescribed Percocet by her pain management clinic. R. 797. Additionally, she reported that

Valium was helping with her anxiety, but that she had not been taking her lithium. *Id.* Physical

examination revealed pressured and tangential speech, as well as poor dentition with obvious

caries. R. 798. Dr. Hilldrup started Pamela on 200 mg Tegretol twice daily for her bipolar

disorder, 5 mg melatonin, and encouraged her to establish care with a local psychiatrist. R. 799.

On December 31, 2015, Pamela returned to Pain Centers of the Blue Ridge with

complaints of neck and back pain. R. 848. She reported that her pain improves with medication.

*Id.* Her Percocet was refilled. *Id.*

On January 29, 2016, Pamela returned to Pain Centers of the Blue Ridge with complaints

of neck and back pain. R. 849. She reported that her pain was well controlled with her current

medication regimen. *Id.* Her medication was refilled. *Id.*

13

On February 26, 2016, Pamela returned to Pain Centers of the Blue Ridge with complaints of neck and back pain. R. 850. She reported her pain was unchanged and she was in good spirits. *Id.* Her medication was refilled. *Id.*

On March 23, 2016, Pamela returned to Pain Centers of the Blue Ridge with complaints of neck and back pain. R. 851. She reported that her pain is controlled with her medication. *Id.* Her Percocet was refilled. *Id.*

On April 20, 2016, Pamela returned to Pain Centers of the Blue Ridge with complaints of neck and back pain. R. 852. She reported feelings of stress but stated her pain was doing well. *Id.* Her medication was refilled. *Id.*

On May 11, Pamela presented to the care of Marcus Speaker, M.D., at Southeast Family Medicine and requested a change in Elavil to help with anxiety, bipolar disorder, and sleep. R. 809–811. Pamela had been off Elavil for three days and did not sleep well the night before. R. 809. She reported increased pain. R. 810. Dr. Speaker noted that the interview was difficult because Pamela was "very tangential." *Id.* ROS was positive for headaches, anxiousness, and insomnia. *Id.* Physical examination revealed an anxious mood; rapid, pressured, and tangential speech; hyperactivity; and impulsivity. *Id.* Dr. Speaker increased Pamela's dosage of Elavil to 100 mg and 200 mg at night. R. 811.

On May 25, 2016, Pamela returned to Pain Centers of the Blue Ridge with complaints of neck pain. R. 853. She reported that her pain was controlled. *Id.* Her prescription was changed to 10 mg oxycodone because she reported difficulty affording Percocet. *Id.*

On June 24, 2016, Pamela returned to Pain Centers of the Blue Ridge with complaints of neck pain. R. 854. She reported no change. *Id.* Her oxycodone was refilled. *Id.*

14

On July 22, 2016, Pamela returned to Pain Centers of the Blue Ridge with complaints of neck pain. R. 855. She reported a decrease of pain with medication. *Id.* Her medication was refilled. *Id.*

On September 28, 2016, Pamela returned to the care of Dr. Hilldrup with complaints of nasal congestion. R. 813–22. Pamela requested a referral to Lewis Gale pain management. R. 819. Physical examination revealed prolonged expiratory phase; accelerated speech; difficulty staying on subject at times; extensive dental decay; and poor hygiene. R. 820. Pamela reported issues with her medication being stolen at home. R. 821. Dr. Hilldrup noted that he would not prescribe narcotics because of Pamela's history of substance abuse. *Id.*

On December 21, 2016, Pamela presented to the care of Marc A. Swanson, M.D., at Blue Ridge Pain Management Associates ("BRPM") for a pain management consultation. R. 858–62. Pamela reported pain rated 8 out of 10 that radiated into her lower extremities. R. 858. Physical examination findings were unremarkable aside from tenderness to palpation in the cervical and lumbosacral spine. R. 861. Dr. Swanson assessed Pamela with chronic pain syndrome, analgesic use, fibromyalgia, cervicalgia, and lumbago. *Id.*

On January 17, 2017, Pamela presented to the care of George Baylor, M.D., of BRPM, with chief complaints of generalized pain and low back pain. R. 867–71. ROS was positive for joint pain, limitation of motion, back pain, stiffness, and leg pain. R. 869. Physical examination revealed tenderness to palpation in the cervical spine and lumbosacral spine. *Id.* Dr. Baylor prescribed 50 mg tramadol. R. 870.

On May 23, 2017, Pamela presented to the care of Gabriel Mosier, M.D., of Southeast Family Medicine with issues including hypertension and bipolar disorder. R. 828–30. Physical

examination findings were unremarkable. R. 829. Dr. Mosier refilled Pamela's amitriptyline and provided her with a list of counseling resources. *Id.*

On August 2, 2018, Pamela presented to the care of Sujina Pradhan, M.D., at Southeast Family Medicine with reports of bipolar disorder, anxiety, and chronic back pain. R. 1266–67. Pamela reported slightly increased anxiety and requested increased dosage of her Elavil. R. 1266. Physical examination findings were unremarkable. R. 1267. Dr. Pradhan continued Pamela on the same dosage of Elavil, started her on Cymbalta, and discontinued her tramadol. *Id.*

On September 16, 2018, Pamela was transported via EMS to Roanoke Memorial Hospital after she was found in an unresponsive state. R. 1412–55. EMS noted a large amount of vomit in her airway that required extensive airway clearing and administered Narcan. R. 1412. Physical examination revealed erratic breathing; edentulous; pupils 4mm sluggishly responsive; tachycardia; coarse lung sounds bilaterally; and multiple scabs and excoriations "all over her skin." R. 1413. Chest x-rays revealed no abnormal findings. R. 1414. CT imagining of the head and brain revealed abnormal cerebellum, suspicious for acute infarction, as well as compression of the fourth ventricle. *Id.* Urine drug screen was positive for benzodiazepine, cannabinoids, cocaine, and oxycodone. R. 1415. Her assessment noted that Pamela's "presentation is consistent with anoxic brain injury from a prolonged down time." R. 1421. Final impression was accidental drug overdose, polysubstance abuse, and acute encephalopathy. R. 1422. Pamela remained hospitalized through October 7, 2018, at which time she was discharged. R. 1432–34.

On October 9, 2018, Pamela presented to the emergency department at Roanoke Memorial Hospital, complaining of confusion. R. 1400–04. ROS was positive for congestion, rhinorrhea, cough, anxiety, arthralgia, and myalgia. R. 1401. Physical examination findings were unremarkable except Pamela did not know what year it was. *Id.* Pamela initially complained of

pain, but that complaint abated. R. 1402. She could not recall her own address. *Id.* A urine drug screen was positive for cannabis. *Id.* Final impression was acute confusion and acute homelessness. R. 1404.

On December 13, 2018, Pamela was transported via EMS to Roanoke Memorial Hospital after she was found in a somnolent state under an overpass. R. 1382–88. EMS noted that Pamela was altered, agitated, and had bruising to her extremities. R. 1382. Physical examination revealed smell of tobacco; bruising over right dorsum to foot; scattered bruises to bilateral upper extremities and lower extremities with superficial abrasions; somnolence; required repetitive stimulation to stay awake; slurred and garbled speech; intermittent agitation; and kicking or flailing of arms in the direction of staff. R. 1383–84. CT imaging of the brain revealed no abnormalities. R. 1384–85. CT imaging of the cervical spine revealed degenerative disease in the spine and indeterminate left thyroid nodules. R. 1385. Final impression was acute fall, acute hypercapnia, and acute confusion. R. 1388–89.

From December 2018 to April 2019, Pamela underwent treatment for breast cancer, including a mastectomy. *See* R. 1218–19; 1221–22; 1250–54; 1456–57; 1523–27; 1533–36; 1545–46; 1581; 1764–1806; 1826–27; 1857; 1861–62.

On April 2, 2019, Pamela presented to the emergency department at Roanoke Memorial Hospital with complaints of right ankle pain. R. 1759–64. Physical examination revealed a moderate amount of swelling over the lateral malleolus of the right ankle and mild tenderness on the distal posterior fibula. R. 1762. Pamela received acetaminophen and ibuprofen. R. 1763.

On April 7, 2019, Pamela presented to the emergency department at Roanoke Memorial Hospital with complaints of right ankle pain. R. 1312–15. The report indicates that Pamela "has multiple [emergency department] visits over the last several weeks for chest pain and ankle pain,

each time requesting Percocet." R. 1312. Pamela was sleeping comfortable upon the doctor's arrival for the physical examination with no signs of acute distress, though she demonstrated some tenderness after the examination began. *Id.* The clinical impression indicates drug-seeking behavior. R. 1314. Pamela received one dose of Ultram, as well as crutches and an Aircast boot. *Id.*

On May 10, 2019, Pamela presented to the emergency department at Roanoke Memorial Hospital with complaints of right lower rib pain after a fall. R. 1308–11. Physical examination revealed tenderness to palpation in the lower ribs. R. 1309. The clinical impression was rib pain on right side as well as contusion of rib on the right side. R. 1311. Pamela received a course of nonsteroidal anti-inflammatory medication and was discharged. *Id.*

### B. Medical Opinion Summary

On December 31, 2013, Marvin A. Gardner, Jr., Ph.D., a medical consultant with Disability Determination Service, conducted a psychological evaluation of Pamela. R. 334–40. Pamela was driven to the examination by her mother-in-law. R. 334. Her posture and gait were normal, her hygiene was good, clothing was appropriate, eye contact was good, and she had a friendly and relaxed manner. *Id.* Dr. Gardner noted that her speech was responsive, and she was generally cooperative. *Id.* On mental examination, Pamela was oriented and denied any visual hallucinations. R. 338. While she stated that she "will hear chatter at times," Dr. Gardner noted that at no time during the 75-minute examination did Pamela appear to be attending to internal stimuli. *Id.*

Pamela reported crying every day and indicated that her energy and concentration were "okay." *Id.* She endorsed intermittent feelings of depression. *Id.* Dr. Gardner noted that Pamela's immediate recall, recent memory, computation skills, and abstract thinking abilities were all

moderately impaired. R. 338–39. However, he noted that Pamela's long-term memory, fund of

general information, concentration, insight, and judgment were all fair or within normal limits.

R. 339. Dr. Gardner noted that Pamela "gave no effort on her informal tests of concentration. She

likely exaggerated to some degree her psychiatric symptoms." R. 339–40. Additionally, he noted

that Pamela "is likely having fewer PTSD symptoms than reported." R. 340.

> Overall, Dr. Gardner opined that Pamela:
>
> [I]s able to perform simple and repetitive tasks and maintain regular attendance in the workplace. She is able to perform work activities on a consistent basis with no more than a moderate impairment of concentration, persistence, or pace. She is of normal intellect and is able to perform work activities without special or additional supervision. She is able to complete a normal workday or work week without interruptions resulting from her psychiatric condition. She was capable of accepting all instructions given by this examiner and responding appropriately with the exception of her informal test of concentration. She is capable of accepting instructions from supervisors when she deems it in her best interest to do so. She reports a history of good social interaction with coworkers. She reports a history of good social interaction with the public as a cosmetologist. She is able to deal with the usual stresses encountered in competitive work.

R. 340.

On June 18, 2015, R.S. Kadian, M.D., a medical consultant with Disability Determination

Service, opined that Pamela can occasionally lift or carry 20 pounds; frequently lift or carry 10

pounds; sit, stand, or walk for about 6 hours in an 8-hour workday; frequently climb ramps,

stairs, ladders, ropes, or scaffolds; balance without limitation; frequently stoop, kneel, crouch,

and crawl; and should avoid concentrated exposure to hazards such as machinery and heights. R.

103–05.

On June 19, 2015, Sreeja Kadakkal, Ph.D., a psychological consultant with Disability

Determination Service, opined that Pamela had no understanding and memory limitations and no

significant limitations in the ability to carry out very short and limited instructions. R. 105.

However, she did have moderate limitations in the ability to carry out detailed instructions;

maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes. R. 105–06.

On October 20, 2015, Donald Williams, M.D., a medical consultant with Disability Determination Service, opined that Pamela can occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; sit, stand, or walk for about 6 hours in an 8-hour workday; frequently climb ramps, stairs, ladders, ropes, or scaffolds; balance without limitation; frequently stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to hazards such as machinery and heights. R. 120–22.

On October 22, 2015, Howard S. Leizer, Ph.D., a psychological consultant with Disability Determination Service, opined that Pamela had the following impairments: epilepsy; fibromyalgia; essential hypertension; alcohol, substance addiction disorders; affective disorders; and anxiety disorders. R. 118. Dr. Leizer further opined that Pamela had mild restriction of activities of daily living; moderate difficulties in maintaining social functions; and moderate difficulties in maintaining concentration, persistence, or pace. R. 118–19.

Additionally, Dr. Leizer opined that Pamela has no understanding and memory limitations but does have sustained concentration and persistence limitations. R. 122. In particular, Dr. Leizer opined that Pamela is moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in

coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 122–23. Regarding Pamela's social interaction limitations, Dr. Leizer opined that Pamela was moderately limited in her ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. R. 123.

On June 13, 2019, William Rutherford, Jr., M.D., a medical consultant with Disability Determination Service, noted that Pamela did not furnish additional evidence on request as was her burden, and so he opined that there was insufficient evidence on file to make a functional determination. *See* R. 980–85.  Likewise, on that same day, Dr. Leizer opined that there was insufficient evidence on file for a Psychiatric Review Technique assessment. R. 982.

On September 29, 2021, Trina Jackson, Psy.D., performed a psychological evaluation of Pamela after a referral from Virginia Disability Determination Services. R. 3400–04. Pamela's posture and gait were within normal limits, and she had no difficulties ambulating. R. 3400. She was dressed appropriately. *Id.* Dr. Jackson indicated that Pamela was "friendly, polite, and cooperative, [and] made good eye contact." *Id.* Mental status examination findings were unremarkable. R. 3401–02.

Dr. Jackson administered 10 subtests of the Weschler Intelligence Scale-Fourth Edition to Pamela. R. 3402. In general intellectual ability, Pamela demonstrated verbal and nonverbal reasoning abilities in the low average range. R. 3402. In verbal comprehension, she demonstrated little or no ability in keeping up with her peers in situations that require verbal skills. R. 3403. In perceptual reasoning, she demonstrated visual-spatial reasoning and perceptual-organizational

skills in the low average range. *Id.* In working memory, she demonstrated an ability to sustain attention, concentrate, and exert mental control in the average range, and her ability to repeat long strings of numbers backwards evidenced good mental control. *Id.* Lastly, in processing speed, Pamela demonstrated an ability in simple or routine visual material without making errors in the low average range when compared to her peers. *Id.*

Dr. Jackson concluded that Pamela has good social skills, enjoys interacting with others, and that social functioning is not an area of concern for her. R. 3404. Additionally, Dr. Jackson found that Pamela has no significant deficits in the area of cognitive and intellectual functioning; demonstrated no difficulties in attention and concentration; and has no difficulties in emotional control. *Id.*

Additionally, on September 29, 2021, Dr. Jackson completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" for Pamela. R. 3405–07. In that form, Dr. Jackson indicated that Pamela had no restrictions in the following work-related mental activities: understanding and remembering simple instructions; carrying out simple instructions; making judgments on simple work-related decisions; understanding and remembering complex instructions; carrying out complex instructions; making judgments on complex work-related decisions; interacting appropriately with the public, supervisors, or co-workers; responding appropriately to usual work situations and to changes in a routine work setting. R. 3405–06. Dr. Jackson noted that "[t]here was no evidence to suggest difficulties in [those] domains. [Pamela's] intellectual functioning is solidly in the Low Average range of functioning, with a strength in her working memory skills." R. 3405.

### C. Pamela's Administrative Hearing Testimony

**1. Administrative Hearing on September 12, 2017**

Pamela testified at an administrative hearing before ALJ Geraldine H. Page on September 12, 2017. R. 35–75.

She testified that she previously graduated high school and was licensed as a cosmetologist. R. 40. She had been working as a cosmetologist until 2003. R. 41. She testified that she required help from her roommate for grooming. R. 43–44. She testified about her fibromyalgia, which she was diagnosed with in 1993, and that she takes Savella, tramadol, and oxycodone to treat it. R. 44–45. She testified that she takes Tegretol to treat her seizures; however, she indicated that she still experiences seizures despite using Tegretol. R. 45. She testified that she takes blood pressure medication, as well as amitriptyline and Valium for anxiety. R. 49.

Pamela further testified that she last had a valid driver's license in 2003, and that she uses the city bus to travel. R. 47. As for her daily activities, she testified that she watches television, reads, and plays chess. R. 48. She testified that she has to use a rollator to ambulate because her right leg will become numb without warning, causing her to fall. R. 50–51. She testified that she suffers from hernias and can lift only 15 pounds without difficulty. R. 55. She testified that she experiences numbness in her hands and will drop items frequently. R. 61.

**2. Administrative Hearing on May 19, 2021**

Pamela testified before ALJ David Lewandowski on May 19, 2021. R. 906–25.

First, Pamela amended her alleged onset date to July 29, 2014, the date of her application. R. 910–11. She testified that it had been a year or more since she last had a seizure. R. 914. She testified that she experiences constant pain in her neck. R. 914–15. She testified that she gets "a

couple [headaches] a week." R. 915. She testified that she suffers intermittent pain in her legs, usually brought on by "[doing] a lot of walking." R. 915–16. She testified that she could sit for only about 20 minutes before she has to get up and stretch. R. 916.

She testified that she no longer had issues with pain in her right foot and ankle. R. 918. She testified that she is typically able to get 8–10 hours of sleep at night. *Id.* She testified about her bipolar disorder, and that she continued to struggle with mood swings. R. 919. She testified that she does not usually have difficulty or problems interacting with other people. R. 920. She testified that she "can concentrate pretty good on things," when there are no distractions around. *Id.* She testified that she does household chores such as washing dishes, although she must stop and take breaks every 15–20 minutes. R. 921.

### 3.  Administrative Hearing on February 1, 2022

Pamela testified again before ALJ Lewandowski on February 1, 2022. R. 3409–20. This supplemental hearing was conducted after Pamela provided additional medical reports and underwent a consultative exam with Dr. Jackson in September 2021. R. 3412.

Pamela testified that she struggles to obtain mental health treatment because of a lack of transportation. R. 3414. She testified that she had not had a seizure since the May 19, 2021, administrative hearing. *Id.* She testified that her neck, back, and leg pain had all improved, although some pain still bothered her. R. 3414–15. She testified that she had only one headache per week on average. R. 3415. She testified that she continued to have to lie down once or twice per day because of tiredness and fatigue. R. 3416. She testified that she still experiences mood changes. *Id.* She testified that her medical conditions do not cause her to wake up at night. R. 3418.

Pamela testified that she does household chores but still must take breaks while doing so. R. 3418. She testified about her difficulties concentrating and elaborated that "if [she is] trying to watch a movie and [there are] other people . . . playing music or in the next room . . . talking and being loud, [she gets] drawn into their conversation . . . [and is] distracted easily." R. 3419.

### D. The Commissioner's Decision is Supported by Substantial Evidence

Pamela argues that the ALJ erred in his assessment of Pamela's (1) mental impairments; (2) subjective allegations; and (3) physical impairments and RFC findings. ECF No. 20 at 26–47.

### 1. The ALJ's Assessment of Pamela's Mental Impairments

First, Pamela argues that the ALJ failed to properly assess her mental impairments as required by SSR 96-8p. *See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p (S.S.A. July 2, 1996). Specifically, Pamela argues that the ALJ failed to explain how the RFC accommodated her moderate limitations in concentrating, persisting, and maintaining pace, in interacting with others, and failed to address her ability to sustain work activity over a normal eight-hour workday. ECF No. 24 at 27–32.

SSR 96-8p requires an ALJ to include a narrative discussion describing how the evidence supports his conclusion when developing the RFC. *See Teague v. Astrue*, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p at *7; *Meadows v. Astrue*, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24 (W.D. Va. Aug. 15, 2012); *see also Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the

25

claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In *Shinaberry v. Saul*, 952 F.3d 113, 121 (4th Cir. 2020), the Fourth Circuit confirmed that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task." Nevertheless, *Mascio* does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." *Id.* In contrast, *Shinaberry* highlights "sister circuits" which conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." *Id.* (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). *Shinaberry* further confirms that *Mascio* simply emphasizes the ALJ's duty to adequately review the evidence and explain his decision.

Here, the ALJ did not summarily conclude that a limitation to simple, unskilled work accounts for Pamela's moderate limitation in concentration, persistence, and pace without further analysis, as happened in *Mascio*. Instead, the ALJ first explained, with citation to the medical evidence, why he found that Pamela has a moderate limitation in concentration, persistence, and pace. R. 884–85. Next, he explained how that moderate limitation translated into Pamela's RFC, because (1) the limitation to simple work "requires less intense focus and concentration than complex work," (2) being off-task 10% of the workday "accommodates [Pamela's] complaints

of anxiety and stress," and (3) the limitation concerning hazards "takes into account [Pamela's] subjective reports of fatigue and reduced concentration." R. 885, 893–94.

Similarly, regarding Pamela's moderate limitation in interacting with others, the ALJ explained how the evidence supported a finding of such a moderate limitation and how that limitation translated into an RFC limitation of only "occasional interaction with others." R. 884, 893. I find that there is substantial evidence in the record to support the ALJ's findings in this regard. *See* R. 106, 123, 334, 340, 3400, 3402, 3404, 3406.

To the extent that Pamela argues the ALJ should have explained in greater detail how the RFC accommodates her moderate limitations in concentrating, persisting, maintaining pace, or interacting with others, I find no deficiency warranting remand. Instead, the ALJ built "an accurate and logical bridge" from the evidence to his conclusions, and this Court is not left to guess at how he arrived from one to the other. *See Mascio*, 780 F.3d at 637.

### 2. The ALJ's Assessment of Pamela's Subjective Allegations

Next, Pamela argues that the ALJ's assessment of her allegations is not supported by substantial evidence. ECF No. 26 at 36–45.

Under the regulations implementing the Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. SSR 16-3p, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms. *Id.* at 3, § 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* § 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's

statements about the intensity, persistence, and limiting effects of the symptoms; statements and

other information provided by medical sources and other persons; and any other relevant

evidence in the individual's case record." *Id.*

"The ALJ may choose to reject a claimant's testimony regarding [her] pain or physical

condition, but he must explain the basis for such rejection to ensure that the decision is

sufficiently supported by substantial evidence." *Mabus v. Colvin*, 2015 U.S. Dist. LEXIS 38179,

*39-40 (S.C. Dist. Mar. 26, 2015) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n. 2 (4th Cir.

1984)). A claimant "is entitled to rely exclusively on subjective evidence to prove that her

symptoms were so continuous and/or so severe that [they] prevent[ed] [her] from working a full

eight hour day,' and an ALJ 'applie[s] an incorrect legal standard' when discrediting [claimant's]

complaints based on the lack of objective evidence corroborating them." *Hines v. Barnhart*, 453

F.3d 559, 563, 565 (4th Cir. 2006); *see also Lewis v. Berryhill*, 858 F.3d 858, 866 (4th Cir. 2017)

(finding an ALJ "improperly increased the burden of proof by effectively requiring claimant's

subjective descriptions of her symptoms to be supported by objective medical evidence"). An

ALJ's assessment of the credibility of a claimant's subjective complaints are afforded a high

level of deference on review, as the Fourth Circuit has proclaimed such assessments are

"virtually unreviewable" on appeal. *Darvishian v. Geren*, 404 F. App'x 822, 831 (4th Cir. 2010).

In this case, the ALJ's opinion includes a thorough and robust discussion of both

Pamela's medical history and Pamela's allegations. R. 886–91. The ALJ found that Pamela's

medically determinable impairments could reasonably be expected to cause her alleged

symptoms. R. 891. However, he concluded that Pamela's statements concerning the intensity,

persistence, and limiting effects of her alleged symptoms were not consistent with the medical

evidence and other evidence in the record. *Id.*

I find that substantial evidence supports the ALJ's conclusions regarding Pamela's subjective allegations. The record indicates that Pamela reported that her daily activities include reading, watching television, online browsing, spending time with her mother-in-law and daughter, doing Sudoku and crossword puzzles, going to church, playing chess, cooking, and cleaning her house. R. 48, 270, 293, 336, 893, 3404. The ALJ explained how these reported daily activities factored into his analysis of the credibility of Pamela's subjective complaints and how that credibility determination translated into Pamela's RFC limitations. R. 893–94, 896.

Additionally, Pamela cites to *Brown v. Comm'r Soc. Sec.*, 873 F.3d 251, 269–70 (4th Cir. 2017); *Arakas v. Comm'r Soc. Sec.*, 983 F.3d 83, 100 (4th Cir. 2020) and other similar cases in the Fourth Circuit. In *Arakas*, the Court found that the ALJ's assessment regarding the claimant's daily activities failed to account for "significant other testimony" from the claimant that was at odds with the ALJ's conclusion. *Arakas*, 983 F.3d at 100. In doing so, the Court determined that the claimant's subjective allegations and activities of daily living were consistent. *Id*. This error is not present in this case. The ALJ explicitly considered Pamela's daily activities, as well as her allegations of her symptoms, and concluded that her reported daily activities suggest a lesser degree of functional loss than generally alleged. R. 895.

In *Brown*, the Fourth Circuit found that the ALJ committed numerous errors, including failing to acknowledge the extent of the activities of daily living, stating:

> With respect to the first reason for the adverse credibility finding, the ALJ noted that Brown testified to daily activities of living that included "cooking, driving, doing laundry, collecting coins, attending church and shopping . . . The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared his meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the

ALJ provided no explanation as to how those particular activities—or any of the activities by Brown—showed that he could persist through an eight-hour workday.

873 F.3d at 263.

Here, unlike in *Brown*, the ALJ's assessment shows he understood Pamela's limits in completing her activities of daily living. *See* R. 884–85, 887, 891, 893. The ALJ, with citations to the record, specifically acknowledged that Pamela participates in her activities and is limited in several regards. *See id.* Additionally, though Pamela correctly points out the record contains consistent complaints of continuous pain, *see* ECF No. 24 at 41, the evidence in the record provides a reasonable basis for a person to question the credibility of her complaints and to infer those complaints as indicating drug-seeking behavior. Thus, I find that the ALJ did not err in his assessment of Pamela's subjective allegations.

### 3.  The ALJ's Assessment of Pamela's Physical Impairments and RFC Findings

Lastly, Pamela argues that the ALJ erred in his assessment of Pamela's physical impairments by failing to determine her RFC using a function-by-function analysis. *See* ECF No. 24 at 45–47.

The ALJ is required to develop an adequate RFC that accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. *See* SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

However, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Comm'r*, 769 F.3d 861, 865 (4th Cir. 2015) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

In *Mascio v. Colvin*, the Fourth Circuit rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that " '[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio*, 780 F.3d at 636 (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

Overall, I find that the ALJ engaged in a sufficient narrative description as required by SSR 96-8p and that discussion contains sufficient information and analysis to allow meaningful review. *See* R. 887, 894–96. He sufficiently explained that the limitation to light work was supported by imaging showing degenerative disc disease of the cervical spine and lumbar spine, as well as by Pamela's reported pain and fibromyalgia diagnosis. R. 892, 895. He sufficiently explained that environmental limitations addressed both Pamela's seizure disorder and COPD, both of which he noted are largely controlled. R. 896.

Therefore, The Court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a comprehensive analysis of Pamela's medical records, the medical opinions, Pamela's testimony, and the ALJ's conclusions. Therefore, the ALJ did not err in his assessment of Pamela's physical impairments and RFC findings.

## CONCLUSION

For the foregoing reasons, I respectfully **RECOMMEND** that an order be entered **GRANTING** the Commissioner's Motion for Summary Judgment, ECF No. 25; **DENYING**

Pamela's Motion for Summary Judgment, ECF No. 23; **AFFIRMING** the final decision of the Commissioner; and **DISMISSING** this case from the Court's active docket.

### NOTICE TO PARTIES

The clerk is directed to transmit the record in this case to Robert S. Ballou, United States District Judge, and to provide certified copies of this Report and Recommendation to counsel of record.

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party must serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered:  March 1, 2024

*C. Kailani Memmer*

C. Kailani Memmer
United States Magistrate Judge